IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF
VIRGINIA LYNCHBURG DIVISION

DANIEL CONRAD CLARK                          )

                          Plaintiff,         )

v.                                           )          Case No: 6:20CV00058

LIBERTY UNIVERSITY, INC.                     )

                          Defendant.         )

CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
8/21/2020
JULIA C. DUDLEY, CLERK
BY:  s/ A. Little
     DEPUTY CLERK

## COMPLAINT

COMES NOW, the Plaintiff, by counsel, and moves this court to grant him judgment against the Defendants. In support thereof, Plaintiff states:

1. Plaintiff is a resident of Virginia and is domiciled in Chesterfield, Virginia.

2. Liberty University Inc. is a nonstock corporation formed under the laws of Virginia with a principal office located at 1971 University Boulevard, Lynchburg, Virginia 24515.

3. This case involves both Federal and State law claims.

4. Venue is proper under 28 U.S.C. § 1391 on the grounds that this is the judicial district in which Liberty University, Inc. resides and a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

5. The Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367 because the federal law claims arise under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-88 and the state law and common

law claims are so closely related to the federal law claims as to form the same case or

controversy under Article III of the United States Constitution.

## STATEMENT OF FACTS

6.  Plaintiff incorporates and re-alleges paragraphs all previous paragraphs as fully stated

    herein.

7.  Plaintiff is a student at Liberty University, Inc. (hereafter "Liberty"), and was enrolled as

    such for the spring semester of 2019.

8.  When Plaintiff enrolled in the Spring Semester, Plaintiff signed Liberty's "Financial

    Responsibility Agreement". (hereafter "FRA"). After delineating the charges for the

    semester, the FRA states:

    "This Financial Responsibility Agreement ("Agreement") constitutes a binding contract
    between the student and Liberty University, Inc. ("Liberty") regarding the matters
    addressed herein.

    PAYMENT OF FEES/PROMISE TO PAY

    Payment Obligation: I understand and agree that when I register for any class at Liberty
    or receive any service from Liberty, I accept full responsibility to pay all tuition, fees, and
    other associated costs assessed as a result of my registration and/or receipt of services in
    accordance with the applicable fee schedule as shown on the Summary of Account,
    according to the Payment Plan Selection previously chosen during Financial Check In
    ("FCI"), and pursuant to all applicable Liberty Academic Catalogs located at, the
    www.liberty.edu/academics/catalogsLibertyWay, **the Liberty Way, and all applicable
    Liberty Codes of Conduct, Codes of Honor, policies and procedures which are
    incorporated herein by reference and to which I expressly agree to be bound.**
    (emphasis added).

    A copy of the FRA is attached to this pleading and is labeled "Exhibit A."

9.  Plaintiff paid all the costs listed in the FRA and began his 2019 Spring Semester.

10. During the Spring Semester, Plaintiff and Rachael Patlen (hereafter "Patlen") were in a

    romantic relationship together.

11. That changed on March 29, 2019 when Patlen assaulted and strangled Plaintiff.

12. This assault and strangulation occurred in Lynchburg, Virginia.

13. Plaintiff suffered bruising, cuts, and a concussion as well as experienced significant emotional harm.

14. Plaintiff went to see a health care provider to treat and examine his injuries.

15. Plaintiff then filed a Title IX Complaint against Patlen with Liberty's Office of Equity Compliance (hereafter "OEC") on April 1, 2019.

16. OEC is a division of Liberty University that enforces Liberty's Discrimination, Harassment, and Sexual Misconduct Policy. Its members are all employees of Liberty and at all times pertinent to this Complaint, OEC employees were acting in the course and scope of their employment.

17. Liberty receives Title IV financial assistance from the Federal government, so it is required by 34 CFR § 106.8(b) to publish grievance procedures for sex discrimination under Title IX.

18. The Discrimination, Harassment, and Sexual Misconduct Policy (hereafter "Policy") is Liberty's grievance procedures that it is required to make and publish pursuant to 34 CFR § 106.8(b). A copy of the Policy is attached to this Complaint and is labeled "Exhibit B."

19. The Financial Responsibility Agreement incorporates this Policy and it forms a contract between Plaintiff and Defendant. In the alternative, the Financial Responsibility Agreement incorporates the Liberty Way into the Agreement and the Liberty Way contains and incorporates the Policy.

20. On April 1st, 2019 Plaintiff was interviewed by Valarie Dufort, an OEC employee.

21. During this time and after, Plaintiff submitted evidence to OEC, including, but not limited to (1) pictures of the wounds caused by Patlen's strangulation, (2) a doctor's report where he examined Plaintiff's injuries the day of the assault which corroborate his claims, and (3) an admission by Patlen that she put her hands around Plaintiff's neck and strangled him (4) and statements by Patlen that she was not hurt during the March 29, 2019 incident.

22. On April 18th, 2019, Patlen was interviewed by Valarie Dufort concerning the March 29, 2019 incident. During that interview, Mrs. Patlen made a complaint to Mrs. Dufort that Plaintiff assaulted her and that she was acting in self-defense during the March 29, 2019 incident. After reviewing the facts presented by Patlen in that interview, Mrs. Dufort found that her story was too inconsistent and did not have merit.

23. Once a complaint proceeds to the investigative stage., the Policy states that the Investigator is supposed to interview the parties and gather any and all relevant evidence to the Complaint. Once the investigation concludes, the Investigator compiles all the statements, written documents, and any other relevant evidence to the investigation into a "Draft Investigate Report (hereafter "DIR") for the parties to review and respond to in turn. Once both parties have responded, their responses create the "Final Investigative Report" (hereafter "FIR") and the investigator decides the case. If either party appeals, it goes to the Review Board for review and decision.

24. During an investigation Liberty may offer "Alternative Resolutions" which seeks to effectively resolve reports and complaints of prohibited conduct under the Policy. Under this, Liberty will offer alternative resolutions at the earliest stage possible with the

cooperation and consent of all the parties, and a complaint will be processed outside of the grievance procedures in the Policy,

25. The whole process from the start of the investigation to the final decision is to be completed within 60 days but may be extended for good cause shown by written notice to the Parties.

26. In this case, Liberty followed this procedure backwards.

27. On June 3, 2019, Plaintiff reviewed the DIR for his complaint that was created by Dufort.

28. On June 11, Hopkins invited Plaintiff to participate in alternative resolution to resolve his Complaint during a phone conversation. This was more than sixty days since the initial complaint, and no notice was given to either party of the extension and the reason for it. During the course of the conversation, Hopkins informed Plaintiff if he did not agree to alternative resolution, he would be put under investigation regarding Patlen's claim.

29. In addition, Hopkins during the conversation informed him of pictures Patlen presented since the reviewing of the DIR on June 11, 2019. Plaintiff expressed he was unaware of any pictures until this phone conversation.

30. Following the call, Plaintiff called Dufort and expressed he felt Hopkins was intimidating him and asked about the time stamp of when the pictures were taken considering, they were presented two months after Patlen's initial interview. Dufort informed plaintiff the pictures were not verified by a time stamp.

31. Following the call with Dufort, Plaintiff emailed Hopkins expressing he would not participate in alternative resolution and expressed concern of the pictures not being

authenticated considering the two-month time gap. Plaintiff never received a response from Hopkins following his email.

32. Later, Nathan Hopkins, the Title IX director for Liberty and an employee and agent of Liberty, Inc., took Mrs. Dufort off of the case between Plaintiff and Patlen because he believed that Mrs. Dufort's decision breached OEC and Title IX protocol and was motivated by gender bias.

33. After Valarie Dufort was removed from the case, Nathan Hopkins then assigned Peter Brake to investigate Mr. Clark's complaint.

34. During the course of these investigations, Mr. Brake never interviewed Patlen.

35. Then on June 20, 2019, Peter Brake gave a notice of investigation against Plaintiff by Patlen arising out of the same complaint Patlen made on April 18, 2019. The very same Complaint that was dismissed months ago due to its complete lack of credibility.

36. Plaintiff then decided to try the alternative resolution procedure and requested that Patlen admit guilt that she strangled and assaulted him, apologize to his mother, and voluntarily withdraw from the University for at least two semesters.

37. Brake did not initially communicate Plaintiff's request to Patlen to admit guilt that she strangled and assaulted him.

38. Brake informed Plaintiff that any statement from Patlen would have to be "carefully crafted" to avoid an admission of guilt since there were criminal cross-warrants in the Lynchburg General District Court arising out of the March 29, 2019 incident and which mirrored the two Title IX complaints in this case.

39. Plaintiff then accepted an apology from Patlen as the result of the alternative resolution procedure, but since there were still unresolved demands, Hopkins halted the alternative resolution procedure.

40. Peter Brake did not re-interview Patlen for this Complaint.

41. A revised "DIR" was made available to the Plaintiff and Patlen on July 12, 2019.

42. During the review of the DIR on July 17th, 2019, Plaintiff noticed a discrepancy between the time stamps of the interview which suggested that there were two separate interviews of Patlen instead of the one by Mrs. Dufort. Brake was not present in the office during this review knowing Plaintiff would be reviewing the revised DIR on this day. The Title IX coordinator to provide the DIR was the only one present in the office during this review. Plaintiff scheduled to continue his review of the DIR on July 19th, 2019.

43. On July 18th, 2019 Plaintiff emailed Brake concerning this discrepancy but Brake did not address the discrepancy.

44. When Plaintiff confronted Brake about the discrepancy, Brake acknowledged the error but when Plaintiff asked to see the change it was not just a date change. It was an entirely separate interview that was not in DIR on Wednesday July 17th during Plaintiff's review.

45. In addition, during this continued review of the DIR on July 19th, 2019, the submitted pictures by Patlen that she claimed supported her injuries she claimed to have sustained in the March 29, 2019 incident were included in the revised DIR. Plaintiff challenged this evidence on the grounds that they were suspicious due to the fact that if Patlen had possessed these pictures since March 29, 2019, why did she wait months to produce and also not produce them in the initial interview in April. Plaintiff requested that Peter Brake

authenticate the date and time of the photograph, but Brake refused to do so and proceeded to not include that information in the DIR.

46. When Plaintiff confronted OEC and Title IX staff about this discrepancy on July 22nd, 2019, Stephanie Steger mockingly and derisively called his attempt to uncover the truth behind this discrepancy as a "game" and falsely accused of him being "belligerent" even though by all reasonable views was calm.

47. Despite Plaintiff, being calm, OEC made a disciplinary complaint against Plaintiff in an attempt to discredit and cause him disciplinary harm.

48. As a result of this Complaint, Plaintiff had to respond to the Office of Community life investigation, and, after explaining his side of the story, received a warning.

49. On July 26, 2019, Plaintiff reviewed Patlen's response to the DIR and submitted his response on July 30, 2019.

50. On that same day, Plaintiff wrote to Hopkins in an email expressing his concern over how the investigation had been handled up to this point. Plaintiff stated to Hopkins that:

"It's uncomfortable and difficult to come in as the victim of a violent assault, strangulation, and other instances of intimate dating violence in which you are the male as the victim and the perpetrator is female. I gave the investigator definitive evidence against the accuser which included texts and emails from the accuser admitting to the violent assault, and that I had done nothing wrong. I presented pictures of my injuries, a detailed physician's report outlining my injuries. While also seven witnesses in which only two were written statements. I do not want to think that because the respondent is a female and I am a male that it has been handled differently than if this was the other way around. Although when my when my father over the phone asked Mr. Brake if it would have taken the department three weeks to have initially interviewed the accused in context to the accuser a female and an accused a male in this case, Mr. Brake said it would have been handled differently which was deeply concerning. I understand you may characterize this as not accurate or can not be proven, but I would not make a dishonest claim."

51. In a July 29, 2019 email to Plaintiff, Hopkins stated that "Mr. Brake did not say this matter would have been handled differently" if the Complainant were a female.

52. On August 9, 2019, Plaintiff received the Notice of Final Outcome for both complaints. This was well beyond the 60-day time frame for Plaintiff's Compliant.

53. Despite the overwhelming evidence to the contrary, Brake found Patlen not responsible for the March 29, 2019 incident on the grounds that Plaintiff's medical evidence was not corroborative of his claim and that it was more likely the result of self-harm. This was so despite the fact that there was no evidence in the investigation of Plaintiff ever harming himself.

54. On August 16th, Plaintiff submitted his appeal to this decision to the Review Board.

55. On August 30, 2019, Plaintiff received notice from the Review Board which upheld the August 9, 2019 decision.

56. On September 9th, 2019 Plaintiff submitted a final appeal to the Vice President of OEC Greg Dowell.

57. On September 17th, 2019 Plaintiff received notice from the Vice President of OEC which upheld the review boards decision.

## COUNT I: BREACH OF CONTRACT

58. Plaintiff incorporates by reference and re-alleges all previous paragraphs as if fully stated herein.

59. "In Virginia, the elements of a claim for breach of an implied covenant of good faith and fair dealing are (1) a contractual relationship between the parties, and (2) a breach of the implied covenant. *Stoney Glen, L.L.C. et al v. Southern Bank and Trust Co.* ,No. 2:2013cv00008 Document 35 (E.D. Va. 2013).

60. "The case law shows two ways in which the duty of good faith and fair dealing may be breached: (1) where a party has a clear contract right, even if its exercise would be arguable arbitrary, the party is only forbidden from acting dishonestly and (2) but where a party has discretion in performance, that party cannot act arbitrarily or unfairly." *Id.*.

61. When Plaintiff enrolled in the Spring Semester, Plaintiff signed Liberty's "Financial Responsibility Agreement". (hereafter "FRA"). After delineating the charges for the semester, the FRA states:

"This Financial Responsibility Agreement ("Agreement") constitutes a binding contract between the student and Liberty University, Inc. ("Liberty") regarding the matters addressed herein.

PAYMENT OF FEES/PROMISE TO PAY

Payment Obligation: I understand and agree that when I register for any class at Liberty or receive any service from Liberty, I accept full responsibility to pay all tuition, fees, and other associated costs assessed as a result of my registration and/or receipt of services in accordance with the applicable fee schedule as shown on the Summary of Account, according to the Payment Plan Selection previously chosen during Financial Check In ("FCI"), and pursuant to all applicable Liberty Academic Catalogs located at, the www.liberty.edu/academics/catalogsLibertyWay, **the Liberty Way, and all applicable Liberty Codes of Conduct, Codes of Honor, policies and procedures which are incorporated herein by reference and to which I expressly agree to be bound.**

62. The FRA is a valid and enforceable agreement is supported by consideration.

63. Plaintiff offered money and Liberty, in exchange, offered educational programs, and this exchange constitutes bargained for consideration, there is mutual benefit and mutual obligation in the FRA.

64. In addition, the FRA, in broad language, incorporates Liberty Codes of Conduct, codes of Honor, and policies and procedures of the University, and the Plaintiff agreed to be bound by them.

65. These codes of conduct, honor codes, and policies and procedures have contractual obligations to them as well besides the language in the FRA.

66. Under the Liberty Way, students can be given fines for violations of the Liberty Way's code of conduct.

67. These fines are defined in the FRA as "other associated costs." Fines fall into four categories: $15.00 fines, $50.00 fines, 150.00 fines, and $300.00 fines.

68. For example, a student can be fined:

   a. $25.00 for missing convocation. This fine is $25.00 for the first two absences and then $50.00 for each subsequent absence.
   b. $150.00 for a violation of the Policy
   c. $150.00 for a participation in social gatherings where alcohol is served.
   d. $300.00 for a violation of the Policy.
   e. $300.00 for possession or consumption of alcohol.
   f. $300.00 for disruption to University Community
   g. $300.00 for conduct inconsistent with Liberty's mission or purpose that compromises the testimony or reputation of the university or disrupts Liberty's Christian learning environment.

69. Not only in light of the language of the FRA are the terms of the Policy and the Liberty Way contractual obligations, they constitute liquidated damages provisions. Only under a contract could Liberty charge a fine for violations of the Liberty Way and the Policy. If they were collecting fines without a binding contract, it would be an unenforceable penalty to which no student would be obligated to pay.

70. Finally, the fines must be paid in order as a condition precedent to reenrollment in the case of dismissal, as well as for other students. If the fines are not paid, Liberty will place a hold on a student's account, prevent them from registering for future classes, accessing services and curriculum, requesting transcripts, and/or receiving the student's diploma.

71. Therefore, the Liberty Way became a binding contract between Plaintiff and Liberty. In the alternative, the Policy became a binding contract between Plaintiff and Liberty. In the alternative, the Policy became a binding contract between the Plaintiff and Liberty by means of the FRA's incorporation of the Liberty Way which in turn incorporates the Policy.

72. Moreover, because Liberty receives Title IV funding, it is required to incorporate federal guidance from the Department of Education into its policies and procedures, and these policies and procedures become contractual obligations.

73. Under the September 2017 Interim Guidance, the Department of Education requires Liberty to conduct "equitable Title IX" investigations. The Department of Education has defined the term "equitable investigation" as follows:

"An equitable investigation of a Title IX complaint requires a trained investigator to analyze and document the available evidence to support reliable decisions, objectively evaluate the credibility of parties and witnesses, synthesize all available evidence— including both inculpatory and exculpatory evidence—and take into account the unique and complex circumstances of each case."

74. In this case, Peter Brake, an employee of Liberty University, was the investigator assigned to investigate Plaintiff's Title IX Complaint.

75. The evidence before the investigator was:

1) Plaintiff's statement that Patlen strangled him;'

2) Photographic evidence of his injuries;

3) A doctor's report which documented Plaintiff's injuries as evidenced in the photographs and a consistent statement to the doctor as to Patlen's battery.

4) Patlen's statement to Plaintiff that she put her hands around Plaintiff's neck.

5) Patlen's statement to Plaintiff's father that after the March 29, 2019 incident she was not hurt.

6) The fact that an initial investigator found Patlen's statements to inconsistent to file a formal complaint against Plaintiff.

76. With this evidence, a trained investigator who analyzed and documented all the available evidence, who objectively evaluated the credibility of the parties and witnesses, who synthesized all available evidence – including both and exculpatory evidence, and who took into account the unique and complex circumstances of the case, would have found Patlen responsible for the strangulation.

77. Peter Brake (hereafter "Brake") was the investigator assigned to the case by OEC, and Brake at all times pertinent to this Complaint was an employee of Liberty and was acting the course and scope of his employment.

78. Brake, had discretion in how he would conduct his "equitable" investigation.

79. By finding Patlen not responsible, Peter Brake acted arbitrarily in making this decision because such a finding required him to ignore credible, and corroborative evidence. He arbitrarily disregarded Patlen's statements concerning her putting her hands around Plaintiff's neck, arbitrarily disregarded Plaintiff's photographic and medical evidence, bolstered Patlen's credibility despite her making inconsistent statements, and arbitrarily diminished the credibility of Plaintiff's evidence.

80. No trained investigator would ignore such evidence.

81. A trained investigator would know how to evaluate such evidence and make a finding of responsibility for Patlen's strangulation of Plaintiff.

82. In the alternative, the policy states that the preponderance of the evidence standard will be used in determining whether a respondent will be found responsible or not responsible for a violation of the Policy. If Peter Brake believed Plaintiff's evidence, he dishonestly changed the standard from preponderance of the evidence to either the "beyond a reasonable doubt" or "clear and convincing evidence" standard of proof.

83. As a direct and proximate cause of this breach, Plaintiff suffered damages and the value of his educational services decreased

### COUNT II: VIOLATION OF TITLE IX § (20 U.S.C. § 1681 *et seq*)

84. Plaintiff incorporates by reference all previous paragraphs and re-alleges them as if fully stated herein.

85. Liberty receives federal financial assistance under Title IV.

86. As a recipient of federal financial assistance, Liberty is subject to the provisions of Title IX.

87. Title IX prohibits gender discrimination in the educational setting.

88. In in the alternative, the elements of a Title IX "erroneous outcome" claim are:

(1) Showing that a Plaintiff was subject to a procedurally flawed or otherwise flawed proceeding;

(2) Which led to an adverse and erroneous outcome; and

(3) Involved particular circumstances that suggest gender bias was a motivating factor behind the erroneous finding." *Doe v. Bd. of Trs. Of St. Mary's Coll. of Md.* 2019 LEXIS 201938.

89. At all times pertinent to this count, Brake, Dufort, Hopkins, Stegar, were employees of Liberty and acting in the course and scope of their employment.

90. While Dufort was the initial investigator on the case, when she refused to open a Complaint made by Patlen against Plaintiff for the same incident. She refused based on the many factual inconsistencies in her story. Hopkins then took her off the case because he believed that her failure to believe Patlen's inconsistent statement and initiate a formal Complaint was based on gender bias.

91. Under the policy, an Investigator may refuse to believe false information or determine that that the conduct does not raise a potential violation of the Policy.

92. Dufort is a skilled investigator and has a law-enforcement training and background.

93. Hopkins' removal of Dufort from the case was motivated by gender bias so that a female's credibility could not be challenged or impeached. This bias permeated the investigation and resolution of this case.

94. In addition, Hopkins failed to adhere to the timeline set forth in the policy. Under the Policy, the resolution of a complaint is supposed to take no more than 60 days without a written extension of time. From the date of the initial complaint to the final decision, the process lasted approximately five months, and Plaintiff did not receive a written notice of the extension of the timeframe. The timeframe in this case was extended not for good cause, but to ensure that Patlen's false complaint could be resurrected to harass Plaintiff without a formal complaint and interview by an investigator.

95. Brake interviewed Plaintiff, but never interviewed Patlen as required by the Policy.

96. The alternative resolution procedure was offered at a time inconsistent with the Policy. During the alternative resolution procedure, Brake refused to ask Patlen for an admission of guilt as requested by Plaintiff while Brake complied with all of Patlen's requests.

97. Plaintiff presented conclusive evidence that he was strangled by Patlen. He presented photographic and medical evidence and corroborative statement by Patlen that she strangled Plaintiff.

98. Moreover, Dufort stated in typical OEC investigations that if a female had presented medical and photographic evidence that she had been assaulted, OEC would have found the male responsible.

99. In addition, when Plaintiff and his father confronted Brake about the length of time it took to initially interview Patlen by stating, "If a woman had made this Complaint, it would have not taken the Title IX department three weeks to initially interview the accused if it was a male." Brake replied to this statement that "No, OEC would have been right on this."

100.    Moreover, on July 22nd, 2019 Plaintiff expressed concerns about the conduct of Brake. Stegar refused to answer his questions, and disparagingly and maliciously referred to Plaintiff's concerns as a "game." Stegar did not treat Patlen this way and it reflects Stegar's belief that men cannot be the victim of assault by a woman and is discriminatory.

101.    In addition, Plaintiff responded to Steger's statement of calling his concerns a "game" by

stating "This is not a game, this is my life", then Stegar deceitfully and maliciously called Plaintiff "belligerent" in an attempt have campus police or security remove him from the OEC office. Stegar does not treat Patlen this way.

102.     In an internal document, Brake stated he was "annoyed" by Plaintiff during the course of the investigation. Brake does not get "annoyed" to the same degree with female complainants, and his annoyance stems from his stereotypical belief that men should be tough and not have to resort to reporting such violence to an authority. Furthermore, because Brake was the decisionmaker in this case, this bias directly influenced his decision in finding Patlen not responsible for the March 29, 2019 incident. This is further evidenced by Brake's description of Patlen as a "victim" despite the overwhelming evidence that she was lying and assaulted Plaintiff.

103. In light of the evidence in the Complaint and Brake's decision and Liberty's ratification of the same, Brake makes his decision not only on discriminatory gender stereotypes that males cannot be victims of violent assaults by females, but also on the bias that he does not want to decide cases in ways that are adverse to females to face severe discipline. These biases permeate OEC and Liberty has a pattern of treating males adversely than females under Title IX.

104. In addition, Dufort stated that in a typical Liberty Title IX investigation that if a female had claimed assault and presented medical evidence corroborating the assault that the male would be found responsible.

105. Furthermore, Liberty, in light of the #MeToo movement and the #believeallwomen" has adopted an unofficial policy, or in the alternative, a pattern of conduct in which it will refuse to impeach the statements of females despite overwhelming evidence to the contrary

so as to not appear biased. Liberty does not give the statements of males the same weight as it does those of females or as of men the same way as impeached and false testimony from women. This distinction is based on gender as evidenced when Hopkins removed Dufort from the investigation, this was based on gender bias and such a practice has permeated OEC investigations under Title IX.

106. The acts of Brake, Stegar, and Hopkins were all motivated by and constituted unlawful gender discrimination.

107. As a direct and proximate result of Brake, Hopkins, and Stegar's discriminatory conduct, Plaintiff suffered serious emotional harm.

108. At all times pertinent to this Complaint, Brake, Hopkins, and Stegar were acting in the course and scope of employment and at the direction of Liberty and acted with deliberate indifference towards Plaintiff as evidenced by the facts stated in the July 26, 2019 email and the facts alleged in this Complaint. Therefore, Liberty is vicariously liable for the discriminatory acts of its agents. Moreover, Liberty ratified this conduct when it denied Plaintiff's appeal and finalized the outcome of Plaintiff's Complaint.

109. In light of these foregoing procedural errors and the evidence gathered by Brake, there is serious doubt that in the outcome that Patlen was found not responsible for the March 29, 2019 incident.

110. This outcome was motivated by unlawful gender discrimination where Liberty removed an investigator who objectively wouldn't believe a female's false accusations to one who would, to an investigator who would not comply with the investigative requests of a male but would with requests from a female, to one who would use his discriminatory bias that men can't be the victims of a violent assault or that men are weak if they complain about

assaults from a women. The decision is also discriminatory and motivated by gender on the grounds that in typical OEC investigations where a female was assaulted by a male and presented medical evidence of the assault, the male would be found responsible and disciplined. Brake, Stegar, and Hopkins were acting in the course and scope of their employment and at the direction of Liberty at the time of these facts, and Liberty ratified these acts. Moreover, Hopkins was on notice of Brake's conduct and these allegations by means of Plaintiff's correspondence with him and the July 26, 2019 email; therefore, Liberty had actual notice of the unlawful gender discrimination, took no action to stop it, and ratified the conduct of its agents when it denied Plaintiff's appeal and finalized the outcome of Plaintiff's complaint. In light of the facts alleged in this Complaint, this amounts to deliberate indifference on the part of Liberty and constitutes an official act not to remedy the unlawful gender discrimination in this case.

111. Hopkins was an appropriate person who could end the discriminatory practice in this case, and Liberty had actual notice of the unlawful gender discrimination.

112. Moreover, in his appeals to the Review Board and the Vice President of the Office of Equity and Compliance, Plaintiff made it known to those entities in his written appeal that decision by Brake to find Patlen not responsible was motivated by unlawful gender discrimination due to giving falsely bolstering the credibility and weight of a female's evidence more than a male's evidence, and deciding the case based on gender and not the facts as well as alleging that if Plaintiff were a female and not a male that the circumstances surrounding the investigation and resolution of his Complaint would have been different. Neither the Review Board or the Vice President of Equity and Compliance

made no official act to stop this discrimination, and both of these entities would have been appropriate persons to end the discriminator conduct put forth by Plaintiff.

113. As a direct and proximate cause of Liberty's discriminatory conduct and deliberate indifference and as a direct and proximate cause of Liberty's erroneous outcome, Plaintiff suffered significant emotional and psychological harm, embarrassment, and mental anguish.

WHEREFORE, Plaintiff moves this court to enter judgment against the Defendant for the foregoing reasons and award him damages in the amount of $800,000.00, costs, attorney's fees as well as any other necessary relief including injunctive relief to remediate and end unlawful gender discrimination at Liberty.

A jury trial is demanded.

Respectfully Submitted,

Daniel Conrad Clark

By:

Joseph R. Sanzone II
VSB#: 86505
Sanzone & Baker, LLP
1106 Commerce Street Suite 3A
Lynchburg, Virginia 24504
Tel: 434-846-4691
Fax: 434-528-5264