CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
5/7/2021
JULIA C. DUDLEY, CLERK
BY: s/ CARMEN AMOS
    DEPUTY CLERK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| DANIEL CONRAD CLARK, *Plaintiff*, v. LIBERTY UNIVERSITY, INC., *Defendant*. | CASE NO. 6:20-cv-58 <br><br> **MEMORANDUM OPINION** <br><br> JUDGE NORMAN K. MOON |

Daniel Conrad Clark, a Liberty University student, is suing the University for breach of contract and for violating Title IX. The claims arise from Liberty's investigation of altercations between Clark and his then-girlfriend, another Liberty student. Liberty asks the Court to dismiss the complaint in its entirety. Dkt. 4. Because Liberty is not contractually bound by its Title IX Policy, the Court will dismiss Clark's breach of contract claim. The Court will also grant Liberty's motion to dismiss Clark's Title IX claim because Clark was not disciplined as a result of the Title IX investigation.

## I. STANDARD OF REVIEW

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) tests the legal sufficiency of a complaint to determine whether a plaintiff has properly stated a claim; it "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). To survive a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff's "'factual allegations must be enough to raise a right to relief above the speculative level,' thereby 'nudging [his] claims across the line from conceivable to plausible.'"

1

*Aziz v. Alcolac, Inc.*, 658 F.3d 388, 391 (4th Cir. 2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The Court must take all facts and reasonable inferences in favor of the plaintiff, disregard any legal conclusions, and not credit any formulaic recitations of the elements. *See Iqbal v. Ashcroft*, 556 U.S. 662, 678 (2009); *Twombly*, 550 U.S. at 555, 557.

## II.   FACTS AS ALLEGED

### A.  Liberty's Financial Responsibility Agreement

Upon enrolling, Liberty requires students to sign its Financial Responsibility Agreement ("FRA"). The FRA states that the document "constitutes a binding contract between the student and Liberty. . . ." *Id.* Under the header "Payment Obligations," signatories of the FRA agree to pay "all tuition, fees, and other associated costs" or registration and/or services and act pursuant to "the Liberty Way, and all applicable Liberty Codes of Conduct, Codes of honor, policies and procedures which are incorporated [] by reference."[1] Dkt. 1-1 at 3; Dkt. 1 ¶ 8; *see id.* at ¶ 19.  Clark signed the FRA prior to the spring 2019 semester. *Id.* ¶ 8.

### B.  Patlen's Assault on Clark

In early 2019, Clark was dating another Liberty student, Rachel Patlen. Dkt. 1 ¶ 10. The two stopped dating a few months into the spring semester after Patlen assaulted and strangled Clark on March 29. *Id.* ¶ 11. Throughout the struggle, Clark admitted to "'grabb[ing] [Patlen's] arms'" in an effort to "'push her off'" because he was "'scared for his life.'" Dkt. 4-1 at 2. The attack left Clark with bruises, cuts, and emotional harm. Dkt. 1 ¶¶ 11, 13. He was tested to make sure he did not have a concussion, but the results were "'not definitive.'" Dkt. 4-1 at 2. On April 1, Clark filed

---

[1] The "Liberty Way" is Liberty's "Student Honor Code." It is attached to Clark's opposition brief, Dkt. 9-1.

a Title IX complaint against Patlen with Liberty's Office of Equity Compliance ("OEC"). Dkt. 1 ¶ 15.[2]

### C. OEC's Title IX Procedures

OEC is a division of Liberty that enforces Liberty's Discrimination, Harassment, and Sexual Misconduct Policy ("Title IX Policy"). *Id.* ¶ 16. As required by law, the Title IX Policy describes Liberty's grievance procedures for sex discrimination *Id.* ¶¶ 17, 19.

Under Liberty's Title IX Policy, when OEC receives a complaint, an investigator must fully assess the details of the complaint, gather information about the alleged conduct, notify all parties about available interim measures and procedural options (among other rights), and, most importantly, confer with the OEC's Executive Director to determine whether an investigation is necessary. Dkt. 1-2 at 34–37.

Once OEC has determined an investigation should be opened, an investigator gathers the relevant evidence and interviews the parties involved before compiling all the materials into a Draft Investigative Report ("DIR"). Dkt. 1 ¶ 23. The parties are sent the DIR and given an opportunity to review and respond, before the investigator publishes a Final Investigative Report ("FIR"). *Id.* Liberty's procedures state that the process must be completed within 60 days, but can be extended by written notice for good cause shown. *Id.* ¶ 25. After an FIR is filed, either party can appeal the decision to the Review Board. *Id.* ¶ 23.

In addition, throughout an OEC investigation, Liberty may offer the parties alternative resolution. *Id.* ¶ 24. The purpose of alternative resolution is to resolve reports and complaints of prohibited conduct at the earliest stage possible and with the consent and cooperation of all the

---

[2] The altercation resulted in criminal cross-warrants in the Lynchburg General District Court. Dkt. 1 ¶ 38.

parties. *Id.* ¶ 24. Alternative resolution permits a complaint to proceed outside of the Title IX Policy's procedures. *Id.*

### D. OEC's Investigation of Clark's Complaint

The same day Clark filed his Title IX complaint with Liberty, an OEC investigator, Valerie Dufort, interviewed him. *Id.* ¶ 20. During the interview, Clark submitted the following pieces of evidence related to the March 29, 2019 incident: (1) pictures of the wounds caused by Patlen's strangulation, (2) a doctor's report describing the examination of Clark's injuries the day of the assault, (3) an admission by Patlen that she put her hands around Clark's neck, and (4) statements by Patlen that she was not hurt during the altercation. *Id.* ¶ 21. In addition to alleging that Patlen strangled him, Clark recounted that Patlen also struck him with what he, at various times, described as a "'full soda can,'" a "'half-full soda can,'" or a "'probably almost empty'" soda can. *See* Dkt. 4-1 at 2.

Clark described two other incidents where Patlen acted in a violent manner. *See id.* The first incident he mentioned happened the previous October 2018. *Id.* That day, Patlen "snapped," kicked and choked Clark, "pulled his beard," and threw his laptop across the room after he lied to her about his "pornography issue." *Id.* She allegedly "'tried to break everything" before leaving the apartment. *Id.* The second incident occurred on March 20, 2019, after an argument in Patlen's apartment. *Id.* Clark was driving when Patlen "struck [Clark's] face, causing his nose to bleed." *Id.* Clark admitted that he tried to grab Patlen but that Patlen "'hit [Clark] so hard' that her 'left shoulder came out of the socket.'" *Id.* After getting out of the car, Patlen allegedly "threw rocks" at Clark. *Id.*

On April 18, Dufort interviewed Patlen. Dkt. 1 ¶ 22. Patlen admitted to slapping Clark—after "he lied to her" about his porn habits—and throwing his laptop, both of which happened in

4

October 2018. Dkt. 4-2 at 4. During the interview, Patlen also complained that Clark assaulted her and that she acted in self-defense. Dkt. 1 ¶ 22. She explained that she felt "threatened" by Clark who is "'a whole foot taller and one hundred pounds heavier.'" Dkt. 4-1 at 3. She stated that when she yelled at Clark, he would "grab her shoulders and 'shake [them] very violently.'" *Id.*; *see also id.* at 4.

With respect to the March 20 incident, Patlen asserted that Clark "'banged his fists on the side of her leg' and grabbed her arm causing 'excruciating pain.'" *Id.* at 4. And as to March 28, Patlen alleged that she did not feel safe because Clark was following her. *Id.* Patlen said that Clark "grabbed her shoulders and pushed her into the side of the car." *Id.* She denied strangling Clark and claimed that any violent actions were in self-defense. *Id.* at 4.

Dufort, finding Patlen's cross complaint against Clark without merit, did not further assess it under Liberty's Title IX Policy. Dkt. 1-2 at 34–37.

Approximately 60 days after Clark's complaint was filed, Dufort issued a DIR in the case against Patlen. *Id.* ¶ 27. Clark reviewed the DIR on June 3. *Id.* A week later, the Title IX director for Liberty, Nathan Hopkins, invited Clark to participate in alternative resolution. *Id.* ¶ 28. Hopkins told Clark that if he did not agree to alternative resolution, Clark would be put under investigation for Patlen's assault claim. *Id.* Hopkins then informed Clark that Patlen had presented photos, supporting her claim, to OEC after the DIR was released. *Id.* ¶ 29.

Clark emailed Hopkins and told him that he would not participate in alternative resolution on his claim. *Id.* ¶ 31. The email expressed Clark's concerns about the time stamps and authenticity of the photos Patlen had submitted. *Id.* Hopkins did not respond to the message. *Id.* Hopkins did, however, remove Dufort from the case and assigned a new investigator, Peter Brake. *Id.* ¶¶ 32–33. The removal, according to Clark, happened because Hopkins felt like Dufort's dismissal of

Patlen's Title IX claim was based on gender bias. *Id.* ¶ 32. On June 20, Brake notified Clark that OEC had opened an investigation against him arising from the Patlen's complaint during her meeting with Dufort in April. *Id.* ¶ 35. Clark then agreed to alternative resolution. *Id.* ¶ 36.

After submitting to alternative resolution, Clark demanded that Patlen (1) admit she strangled and assaulted him, (2) apologize to his mother, and (3) voluntarily withdraw from Liberty for at least two semesters. *Id.* His request was not initially communicated to Patlen in full. *Id.* ¶ 37. Instead, Brake told Clark that any statement from Patlen would have to be "carefully crafted" to avoid an admission of guilt, since there were criminal-cross warrants in the Lynchburg General District Court arising out of the March 29 incident. *Id.* ¶ 38. Because the parties could not agree to a resolution, Hopkins halted the alternative resolution process. *Id.* ¶ 39.

OEC sent Clark and Patlen a revised DIR on July 12. *Id.* ¶ 41. The revised DIR differed from the first DIR in two important ways. First, the revised DIR included information about a second interview with Patlen. *Id.* ¶ 43–44. Second, the revised DIR included the photos submitted by Patlen; the same photos which Hopkins referred to during his call with Clark in mid-June. *Id.* ¶ 45. After reviewing the updated report, Clark requested that Brake authenticate the time and date of Patlen's photographs, but Brake refused to do so. *Id.*

Clark was also troubled by the fact that Patlen had been interviewed on two separate occasions. *See id.* ¶¶ 42–44, 46. When he tried to confront OEC and Title IX staff regarding his concerns about the authentication of the photos and Patlen's second interview, he was unsuccessful. For example, after he approached staff member Stephanie Steger, she "mockingly and derisively" called his attempt to uncover the truth a "game" and called Clark "belligerent," even though he was calm. *Id.* OEC then made a disciplinary complaint against Clark—resulting in a warning from the Office of Community Life. *Id.* ¶¶ 47–48.

Clark reviewed Patlen's reply to the revised DIR on July 26. *Id.* ¶ 49. He submitted his response on July 30. *Id.* Clark then sent Hopkins an email expressing frustration about how the investigation had been handled. *Id.* ¶ 50. The email also referenced a phone call between Clark's father and Brake. *Id.* During the call, Brake allegedly said that if Clark had been a female and Patlen a male, the case would have been handled differently. *Id.* Hopkins's response email denied that Brake made such a statement. *Id.* ¶ 51.

On August 9, Clark received a FIR for both complaints. *Id.* ¶ 52. Brake found Patlen not responsible for the March 29 incident. *Id.* ¶ 53. However, Brake *did* find Patlen responsible for misconduct in connection with the October 2018 incident because she admitted to hitting Clark after he lied about his pornography habit. Dkt. 4-1 at 11. Even though Brake did not find Patlen responsible for the March 29 altercation, he also did not find Clark responsible for any misconduct. *Id.* at 11, 16.[3]

Consequently, OEC did not sanction Clark or subject him to any adverse action. In contrast, Patlen was sanctioned. *Id.* at 17. She was required to undergo twelve hours of counseling and ordered to cease all contact with Clark. *Id.* at 17. From the date of the initial complaint until the final decision, the process lasted approximately five months. *Id.* ¶ 94.

### III. DISCUSSION

#### A. Use of Defendant's Exhibits

As a preliminary matter, Liberty asks the Court to consider the FIR from Clark's Title IX complaint, which Liberty attached as an exhibit to its motion to dismiss. Dkt. 4-1. Clark opposes the Court's consideration of the attached FIR.

---

[3] Clark appealed Brake's FIR findings about the March 29 incident. The Review Board upheld the decision after Clark appealed. Dkt. 1 ¶¶ 54–55. Clark submitted a final appeal to the Vice President of OEC, Greg Dowell, who also upheld the findings. *Id.* ¶¶ 56–57.

Generally, extrinsic evidence may not be considered at the motion to dismiss stage. *Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004). However, the Fourth Circuit has held that a document attached to a defendant's motion to dismiss may be considered "in determining whether to dismiss [a] complaint [if] it was integral to and explicitly relied on in the complaint and [if] the plaintiffs do not challenge its authenticity." *Id.* (quoting *Phillips v. LCI Int'l Inc.,* 190 F.3d 609, 618 (4th Cir.1999)) (internal quotation marks omitted). "A necessary prerequisite for such a finding [that a document is integral] is the plaintiff's reliance on the terms and effect of the document in drafting the complaint." *Henderson v. Gen. Rev. Corp.*, 2018 WL 4604555, *7–8 (W.D. Va. Sept. 25, 2018).

Importantly, much of the complaint centers around the process leading up to the FIR and the result of the report itself. Dkt. 1 ¶¶ 27–29, 41, 43–46, 49–53. Omitting the FIR gives the Court a limited view of the full scope of the Title IX investigation. For instance, the complaint only mentions a Title IX investigation into the March 29 altercation. It conveniently leaves out the two other instances which were investigated. Clark also alleges that the FIR ultimately held Patlen "not responsible for the March 29, 2019 incident." Dkt. 1 ¶ 53. But such a statement is misleading without the full context of the Title IX investigation. Although Patlen was not found responsible for the March 29 altercation, the FIR *did* hold her responsible for the October 2018 incident. As a result, she was sanctioned for her actions.

For these reasons, the Court finds that the FIR is integral to the complaint and that Clark does not challenge the authenticity of the FIR. Thus, the Court will consider the FIR.

### B. Breach of Contract

Clark's first claim is that Liberty's Title IX Policy is an enforceable contract, and that Liberty breached its contractual obligations when the school failed to comply with its internal Title

IX procedures. Dkt. 1 ¶¶ 58–83. Clark presents two arguments in support of his breach of contract claim. First, he argues that the Title IX Policy is an enforceable contract because of its incorporation in the FRA. In the alternative, he contends that the Liberty Way, which is referenced in the FRA, incorporates the Title IX Policy—binding both parties to its terms. Even assuming, without deciding the question of whether the FRA is a valid contract, the Court finds that Liberty's Title IX policies do not create an enforceable contract with Clark.

"The elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Filak v. George*, 564 S.E.2d 610, 614 (Va. 2004). Regarding the first element, "[i]t is well settled that Virginia law requires an absolute mutuality of engagement between the parties to a contract such that each party is bound and has the right to hold the other party to the agreement." *Brown v. Rector & Visitors of Univ. of Va.*, No. 3:07cv00030, 2008 WL 1943956, at *5 (W.D. Va. May 2, 2008), *aff'd sub nom. Brown v. Rectors & Visitors of Univ. of Va.*, 361 F. App'x 531 (4th Cir. 2010). Moreover, this Court has already found that a prior version of the Title IX Policy was not a contract. *Owen v. Liberty Univ.*, No. 6:19-CV-00007, 2020 WL 1856798, at *7–8 (W.D. Va. Apr. 13, 2020); *Jackson v. Liberty Univ.*, No. 6:17-CV-00041, 2017 WL 3326972, at *7 (W.D. Va. Aug. 3, 2017). And although these decisions are not binding, the facts here dictate the same result.

To start, the Title IX Policy specifically states that it "does not create a contractual obligation on the part of the University. The University reserves its right to amend this Policy at any time and for any reason, including an informal amendment to ensure fairness in the investigation and resolution processes." Dkt. 1-2 at 52.

This language itself shows that the Title IX Policy is subject to continual modification and review, preventing it from being mutually binding and enforceable. Indeed, courts applying Virginia law routinely reject the notion that university policies and handbooks, which institutions may change unilaterally, do not create mutuality of obligation. *See, e.g.*, *Doe v. Washington & Lee Univ.*, No. 6:14-CV-00052, 2015 WL 4647996, at *11 (W.D. Va. Aug. 5, 2015) (finding that the policies of Washington and Lee University are under continual examination and revision and therefore there is no mutuality of engagement and no binding contract); *Abbas v. Woleben*, No. 3:13–cv–00147, 2013 WL 5295672, at *4 (E.D. Va. Sept. 19, 2013) ("The handbook states that 'it is a useful guide. . . [and] proposed modifications are always welcome.' These terms do not bind [the Medical College of Virginia] because they can change them at any time. Thus, the handbook does not establish a contract.").

Because different versions of the policy can exist over time, subject to the unilateral revisions of the University, the Title IX policy cannot be a contract, even if it is incorporated under a valid contract. *See also Tesler v. Miller/Howard Investments, Inc.*, 2019 WL 429296, at *6 (S.D. Ind. Feb. 4, 2019) (stating that "incorporation by reference into what may be a contract is not enough to make a contract out of [] Policies," especially because those policies "can be modified at any time by [defendant employer]" and "[a]n agreement to provide benefits as outlined in the [] Policies is no agreement at all, since [defendant employer] could modify the [] Policies at any time at its sole discretion").

Clark attempts to circumvent settled law by arguing that the Liberty Way, which is also referenced in the FRA, incorporates the Title IX policy as a contractual term. However, just like the Title IX Policy, the Liberty Way is also not a contract. *See Jackson*, 2017 WL 3326972, at *7. Indeed, the document is a guide for students, not a binding agreement with Liberty. The document

states that: (1) it is also known as the "Student Honor Code;" (2) attendance is a "privilege" and that Liberty is "free to control admission and attendance of students;" (3) "The Student Honor Code is not a contract and does not create obligations that bind the university in any way;" and (4) Liberty reserves the right to amend or revise the procedures "at any time and for any reason." Dkt. 9-1 at 2. The terms of the Liberty Way do not create mutuality of obligation, meaning that it cannot be a binding contract under Virginia law.

Accordingly, because there is no mutuality of obligation—and thus no contract—between Clark and Liberty with respect to the Title IX Policy or the Liberty Way, the Court will dismiss count 1.[4]

### C. Violation of Title IX

Clark's second count is a Title IX claim under an erroneous outcome theory. *Id.* ¶ 88. "To prevail on an erroneous outcome claim, a plaintiff must (1) assert that he 'was innocent and wrongly found to have committed an offense,' (2) establish 'facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding,' and (3)

---

[4] Even if the Court construes the Title IX Policy as creating a binding contract, the claim still fails because Clark fails to sufficiently allege damages. *See e.g.*, *Blick v. Shapiro & Brown*, *LLP*, 2016 WL 7046842, at *3 (W.D. Va. Dec. 2, 2016) (dismissing a breach of contract claim because the plaintiff "merely makes conclusory legal statements that he is entitled to actual damages, but does not allege any facts making it plausible that he was injured by Defendants' breach"). The only allegation in the complaint about damages is that "as a direct and proximate cause [sic] of this breach, Plaintiff has suffered damages and the value of his educational services decreased[.]" Dkt. 1 ¶ 14. No additional facts support the damages showing required under a breach of contract claim. In his opposition brief, but not in the complaint, Clark claims that damages totaled $12,278.92. However, he cannot use his brief to amend his complaint. *See e.g.*, *JTH Tax, Inc. v. Williams*, 310 F. Supp. 3d 648, 653 (E.D. Va. 2018) (noting that "the court need not consider new allegations or new facts that were available to the plaintiff when it filed the complaint, but were only introduced in an opposition to a defendant's motion to dismiss") (internal citation and quotation marks omitted). Even if that number could be used, the complaint does not put forward any facts about how Liberty's alleged breach caused him financial harm. Nor are there facts alleging how the breach is connected to the number he now offers.

demonstrate 'particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding.'" *Doe 2 by & through Doe 1 v. Fairfax Cnty. Sch. Bd.*, 832 F. App'x 802, 805 (4th Cir. 2020) (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994)).

Clark cannot, and does not, allege sufficient facts to support a Title IX erroneous outcome claim. The fact that Liberty did not find Clark responsible for any wrongdoing is paramount in this case. Indeed, Liberty did not impose any sanctions or disciplinary punishment against him. *See* Dkt. 4-1 at 16–17. Instead, Clark largely takes issue with the procedures and outcome of the investigation, despite the fact that OEC found Patlen responsible for the October 2018 altercation and imposed sanctions against her. *Id.* Nor has Clark cited any authority supporting the proposition that allegations of inadequate Title IX procedures are sufficient to state a claim under Title IX where, as here, the purported procedural defects did not result in any disciplinary consequence to the plaintiff. Because he cannot plausibly allege that he was disciplined, in this context, Clark has no claim under Title IX.[5] Therefore, Liberty's motion to dismiss count 2 will be granted.

## IV. CONCLUSION

For the reasons set out above, the Court will grant Liberty's motion to dismiss count 1, with prejudice. The Court will further grant Liberty's motion to dismiss count 2.

---

[5] This case was briefed and argued prior to the Fourth Circuit's decision in *Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230 (4th Cir. 2021). In *Sheppard*, the Fourth Circuit adopted the Seventh Circuit's approach to Title IX claims in the context of higher-education proceedings. *Id.* at 235–36. The standard asks the direct question: "do the alleged facts, if true, raise a plausible inference that the university discriminated against [the student] on the basis of sex?" *See id.* at 235 (citing and quoting *Doe v. Purdue Univ.*, 928 F.3d 652, 667 (7th Cir. 2019)). But even under this standard, Clark's claim fails because he was not subject to any discipline by Liberty. *See Doe v. Univ. of Ark.-Fayetteville*, 974 F.3d 858, 864 (8th Cir. 2020) ("To state a claim, therefore, [plaintiff] must allege adequately that the University disciplined him. . . .") (citing *Purdue*, 928 F.3d at 667).

The Clerk of the Court is directed to send a copy of this Memorandum Opinion and accompanying Order to Defendant and all counsel of record.

Entered this 7th day of May, 2021.

_____
NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE